**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

UNITED STATES OF AMERICA

V.                                                    **CRIMINAL ACTION**
                                                      **NO. 04-10237-NG**

RAMON DIAZ

## MEMORANDUM OF LAW OF RAMON DIAZ IN SUPPORT OF HIS MOTION TO SUPPRESS

OVERVIEW

On February 26, 2004 at approximately 4:30 p.m. members of the New Bedford Police Department stopped a **green Mazda Millennia** occupied by **Ramon Díaz** and **Jonathan Matos** in New Bedford.   The stop of the automobile was conducted without a warrant.  The defendant **Ramon Diaz** asserts that there was no probable cause to stop and search the car, and that any evidence seized must be suppressed as a matter of law.

FACTS

The decision to stop and search the automobile on February 26 was prompted by information the police received from an informant around noon that day.  The informant told the New Bedford Police that he/she had just purchased a quantity of cocaine from the defendant **Jonathan Matos** from a **green Mazda Millennia**. This informant had been providing law enforcement with information

about the activities of **Mr. Matos**, and his alleged co-defendant **Ramon Diaz**, and had even participated in a "controlled buy" of narcotics from **Mr. Matos** more than six weeks earlier.

On February 26, 2004, the informant, a known drug user, had not been authorized to purchase narcotics. The alleged purchase he/she made was conducted without the knowledge or permission of the police, and could have been construed as a criminal act.

This informant had first provided the New Bedford police with information about **Mr. Matos** in November of 2003. At that time he/she told New Bedford police Detective Shain Ramos that a person identified as **Freddy** was making deliveries to the informant.

The informant was identified as a drug user who had provided the New Bedford police with information that had resulted in the conviction of one Daniel Morales on drug charges. (Morales had been convicted in February of 1999, some five years before the stop and arrest of the defendants in this case.)

He/she also told the police in November of 2003 that Mr. Matos' had a source of supply in Providence, Rhode Island. Later, the informant identified Mr. **Diaz** as **Mr. Matos'** co-conspirator.

A subsequent police investigation observed **Mr. Matos**, alone and in the company of **Mr. Diaz**, engaged in conduct that the police believed was consistent with street level sales of narcotics. **Mr. Matos** was seen driving numerous vehicles, none of which appeared to be registered to him.

During the one controlled buy of cocaine, **Mr. Matos** was driving a white van. The police had made note of the numbers on the license plate affixed to the van.

The police first saw Mr. the **green Mazda Millennia** on January 26, 2004, more than three weeks after the controlled buy and a month before they decided to pull it over and search it.  The **Millennia** had attached to it the same license plates that the police had seen on the white van during the controlled buy.

There was no information in the police reports filed in this matter indicating that the license plates were illegally attached or that either vehicle was illegally registered or licensed.

Some four and one half hours after receiving word of the alleged unauthorized purchase of cocaine on February 26, 2004, the police saw the **green Mazda Millennia** on the streets of New Bedford.  **Ramon Diaz** was driving the car and **Mr. Matos** was the front seat passenger.

The police followed the car as it crossed the border between Massachusetts and Rhode Island.  The car traveled to an address in Cranston, Rhode Island.  Both occupants of the car left the vehicle and entered a private residence.  They emerged three to four minutes later and got back into the car. According to the police reports filed in the case, neither person was seen carrying any objects as they got into the car.  The police did not note that either occupant of the **Millennia** made what appeared to be attempts to secret any objects within the car.

According to the police reports, the car promptly left Cranston, Rhode Island and headed back towards Massachusetts, with the police following at a discreet distance.

The police did not note any furtive gestures on the part of either occupant in the car. The car drove back into Massachusetts without committing any motor vehicle infractions. During the travel to and from Rhode Island, **Mr. Diaz** did not engage in any evasive "counter surveillance" driving techniques.

Neither the informant nor any source of information to the police had told them that either **Mr. Matos** or **Mr. Diaz** would be "re-upping" their narcotic supply on the day they were arrested.

Once the vehicle was stopped and the occupants removed from the vehicle. Neither defendant possessed any contraband on his person. The police found a quantity of cash located on the front seat of the car. A subsequent search of the interior of the passenger compartment revealed the presence of an electronic hide behind the dashboard.

The hide contained a quantity of cocaine and a firearm.

During questioning the defendants made statements that were internally inconsistent.

ARGUMENT

I.    THE POLICE LACKED PROBABLE CAUSE TO STOP THE MOTOR VEHICLE ON FEBRUARY 24, 2004

A warrantless search of an automobile will be upheld if "officers have probable cause to believe that the vehicle contains contraband." ***California v.***

*Acevedo,* 500 U.S. 565 (1991); *United States v. Ross, 456 U.S. 798, 808, 72 L. Ed. 2d 572, 102 S. Ct. 2157 (1982).*

The government bears the burden of proving the lawfulness of the search. *Mincey v. Arizona, 437 U.S. 385, 390-91, 57 L. Ed. 2d 290, 98 S. Ct. 2408 (1978); United States v. Cruz Jimenez, 894 F.2d 1, 7 (1st Cir. 1990).* [\*\*8] The government bears the burden of demonstrating that law enforcement officers had "a belief, reasonably arising out of circumstances known to the seizing officer," that the vehicle "contained that which by law is subject to seizure and destruction," *Carroll v. United States, 267 U.S. 132, 149, 69 L. Ed. 543, 45 S. Ct. 280 (1925).* n3 Our focus is on "what the agents knew at the time they searched the car," *United States v. Goldman, 41 F.3d 785, 787 (1st Cir. 1994).*

"..there must have been particularized facts indicating that, at the time of the search, the vehicle ……… carried contraband, evidence of crime, or other seizable material." *United States v. Martinez-Molina,* 64 F. 3d 719 at 730 (1st Cir. 1995)

The police did not have a reasonable belief that the **Mazda** contained narcotics when they stopped and searched it.

While they had seen the defendants engaged in what they believed to be suspected narcotics deals in the past out of other vehicles, including one that bore the license plates that were later affixed to the **green Mazda**, they had never witnessed any controlled buys from the car. They also had not witnessed either of these defendants engaged in any activities consistent with the sale of

illegal narcotics since January 4, 2004, when **Mr. Matos** had made a controlled sale of narcotics to the informant.

From the time the police saw the two defendants in this case inside the **green Millennia** on February 26, 2004, neither defendant engaged in any activities that could remotely be considered illegal.

The justification for stopping and searching the car rested on two assertions of their informant:  that **Mr. Matos'** source of supply was located in Providence, Rhode Island and that he/she had made an illegal purchase of cocaine from **Mr. Matos** in a **green Millennia** earlier that day.

Despite the lengthy observations by the police of the defendants during the trip to and from Rhode Island, the police saw nothing to corroborate the informant's assertions that **Mr. Matos** was selling cocaine, that the car contained contraband or that either defendant was engaged in any illegal activity. Cf. *United States v. Jackson*, 918 F. 2d 236 (1st Cir. 1990) (furtive hand gestures in the front seat of an automobile sufficient to justify *Terry* stop); *United States v. Woodrum,* 202 F.3d 1 (1st Cir. 2000) (slouching down in back seat and evasive behavior sufficient to justify *Terry* stop);  *United States v. Strally*,  915 F 2d 34, 56 (1st Cir. 1990)

Mr. Diaz' conduct while driving the green Millennia did nothing to bolster the informant's naked assertion that Mr. Matos had a source of supply in Providence, Rhode Island. He stopped at an unknown address in Rhode Island, entered and left a residence and returned in the Mazda to Massachusetts.

Neither **Mr.Matos** nor **Mr. Diaz** carried nor were seen secreting any objects inside the car.

**Mr. Diaz** did not engage in any evasive driving techniques designed to detect the presence of surveilling police officers on the trip to Rhode Island. Nor did he attempt to evade the police on the return to Massachusetts. ***United States v. Martinez-Molina,*** 64 F. 3d 719 at 724, 725 (1ˢᵗ cir. 1995);***United States v. Bashorun***, 22 F. 3d 9 at 12, 15, 17 (1ˢᵗ Cir 2000); ***United States v. Vargas***, 633 F 2d 891 at 896 (1ˢᵗ Cir.1980)

Apparently the police were unable or unwilling to corroborate any of the details provided by their informant about the alleged purchase of narcotics earlier that day. The purchase was not "controlled" by law enforcement and the substance allegedly purchased had not been turned over to the police for field-testing.

The only first-hand indications possessed by the police of alleged illegal activities on behalf of either of these co-defendants had occurred during a controlled buy from the co-defendant **Matos** in late January of 2004 and suspected street level sales pre-dating that sale.

Those observations had occurred too remote in time to justify probable cause to believe that the **green Mazda Millennia** contained contraband on when it was stopped and searched. ***United States v. Schaefer***, 87 F. 3d 562, 568 (1ˢᵗ Cir. 1996)

The police did not have particularized facts indicating the green Mazda Millennia contained contraband or evidence of a crime at the time they stopped it. **United States v. Martinez Molina**, **supra**, at 730.

II.    THERE WAS NO PROBABLE CAUSE TO ARREST RAMON DIAZ

The police may arrest a suspect without a warrant when they have probable cause to believe that the person has committed or is committing a crime.  **United States v. Watson**, 423 U.S. 411, 416-418 (1976)

"Probable cause is a fluid concept—turning on the assessment of probabilities in particular fact contexts", **Illinois v. Gates**, 462 U.S. 213, 232 (1983).

"..a person's mere propinquity to others independently suspected of criminal activity does not without more, give rise to probable cause to search that person." **United States v. Martinez-Molina**, 64 F. 3d 719, 726 (1995) citing Ybarra v. Illinois 444 U.S. 85, 91 (1979) citing **Sibron v. New York**, 392 U.S> 40, 62-63 (1968)

In this case the police had received information from their informant that **Mr. Diaz** was involved with **Mr. Matos** in **Matos**' drug dealing. They had not conducted any controlled buys from Mr. **Diaz**, nor had their informant told them that he/she had purchased narcotics from Mr. **Diaz** on February 26, 2004.

The police had seen Mr. **Diaz** more than a month before he was arrested, engaged in suspicious activity with **Mr. Matos**. In **Sibron v. New York**, **infra**, the police had seen the defendant speak with known narcotics agents over a period

of eight hours, but had not seen anything change hands between the defendant and the addicts. In *United States v. Chadwick*, 532 F. 2d 773, 784 (1st Cir. 1976) picking up a suspected drug traffickers at the train station and helping them load a foot locker full of contraband did not constitute probable cause.

In *United States v. Martinez-Molina, infra* at 723-5 a DEA agent saw a group of men parked near a basketball court. None of them were playing basketball nor were any of them in possession of anything typical of a sports playground. The agent saw the men placing large handbags in a number of vehicles that approached. The handbags contained square shaped items similar in packaging to cocaine. Vehicles that left the playground were followed by undercover police officers and engaged in countersurveillance techniques. The arrests were held to be lawful.

The Court followed a two-step procedure first outlined in *United States v. Hillison* 733 F 2d 692, 697 (1984). That court looked to whether the known criminal activity was contemporaneous with the association and whether the circumstances suggest that the criminal activity could have been carried on without the knowledge of all persons present. *Martinez-Molina infra* at 727 citing *Hillison* infra at 697.

While it could be argued that there was probable cause to arrest Mr. **Matos** for his alleged controlled sale of narcotics to the informant some six weeks before the police arrested Mr. **Diaz**, there was nothing of a criminal nature that the police observed on February 26, 2004 and no probable cause to arrest

Mr. Diaz until after the contraband was located hidden inside the dashboard of a car that was not registered to him.

CONCLUSION

As there was no probable cause to believe that the vehicle contained cocaine on the evening in question or to arrest Mr. Diaz, all evidence secured as a result, including any statements made by this defendant after the stop, must be suppressed as the fruits of the poisonous tree. *See **Wong Sun v. United States**, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963).*

Respectfully submitted
Ramon Diaz
By his counsel

Raymond A. O'Hara
MA. BAR #546366
1 Exchange Place
Worcester, MA 01608
508 831-7551

CR# 04-1801-C4S

## AFFIDAVIT OF SHEILA M. O'HARA

I, Sheila M. O'Hara, being duly sworn, do state that:

1.    I am a Special Agent with the Bureau of Alcohol, Tobacco and Firearms ("ATF"). I have been an ATF Special Agent for over 16 years, and during that time I have been involved in numerous investigations of violations of Federal Firearms Laws. I am currently assigned to a group in the Boston Field Division of ATF that, in part, works with other Federal, State and local police departments in and around the Metropolitan Boston area to investigate and prosecute violations of Federal firearms, explosives and controlled substance laws.

2.    Based on my training and experience as an ATF Special Agent, I am familiar with Federal firearms laws and know that it is a violation of Title 18, U.S.C., Section 922(g)(1), for a previously convicted felon to possess a firearm and ammunition. I also know that it is a violation of Title 18, U.S.C., Section 924(c), for a person to use or carry a firearm during or in relation to a drug trafficking crime. I also know that it is a violation of Title 21 U.S.C., Section 841(a)(1), for a person to possess narcotics with the intent to distribute them.

3.    The facts stated herein are based upon my personal involvement in this investigation and my discussions with other law enforcement officers involved with this investigation. In submitting this affidavit, however, I have not included each and every fact known to me about the investigation, but only those facts, which I believe are sufficient to establish the requisite probable cause.

4.    In November of 2003 New Bedford Police Department Detective Shain Ramos ("Detective Ramos") opened an investigation into a

1

cocaine distribution enterprise after receiving information from
a confidential reliable informant ("CI"). The CI is an admitted
user of cocaine and is familiar with the methods used to package
and prepare this controlled substance for street level sales and
is also familiar with the common terminology used when referring
to this drug. The CI has proven accurate and reliable in the past
by providing information into the operations of numerous lower to
upper level drug dealers resulting in the seizure of narcotics,
as well as arrests and convictions. The CI advised a New Bedford
detective that he regularly purchased cocaine from an individual
named Freddy and that Freddy is considered an upper-level dealer
who could provide cocaine in bulk. The CI also provided the
detective with a list of the cars that Freddy was using to
deliver cocaine to the CI. The CI further advised that Freddy was
the supplier of cocaine to Gordon Gomes, known in the street as
"G," who was known to New Bedford detectives to be a street-level
cocaine dealer. The CI did not know where Freddy was residing,
however CI did advise detectives that Freddy (later identified as
MATOS) could be seen making frequent deliveries of cocaine to
Gomes' residence at 111 Park Street in New Bedford. The CI
additionally provided detectives with Gomes' telephone number
(508-992-4253). Through the use of a pen register, detectives
learned that there were approximately 642 phone calls made from
111 Park Street to MATOS' cellular telephone in a one month
period. In addition, a New Bedford detective had received
information from several different confidential informants that
Gomes was selling cocaine out of the 111 Park Street address.

5.   After speaking with the CI, Detective Ramos attempted to
learn the identity of Freddy. In speaking with Detecive John
Encarnacao, Detective Ramos learned that Detective Encarnacao had

2

started his own investigation into a drug delivery service being operated by an individual using the name Freddy. Detective Encarnacao's investigation revealed that the true identity of Freddy was Jonathan MATOS. Upon learning Freddy's true identity, Detective Ramos showed the CI a photograph of MATOS and the CI identified MATOS as the person he knew as Freddy. During this meeting with the CI, the CI also advised Detective Ramos that MATOS was most recently making cocaine deliveries with another man who MATOS had identified as his uncle. The CI stated that MATOS' uncle used the name "Lucito". According to the CI, MATOS had stated that "Lucito" had recently been released from prison. The CI stated that he believed that Lucito was MATOS' new business associate in the cocaine busines. Further investigation revealed that "Lucito" was Ramon DIAZ. Detectives showed CI a photograph of DIAZ and CI identified the photograph as the person he knew as Lucito. The CI further advised detectives that MATOS had stated that DIAZ had a drug supplier in Providence, Rhode Island.

6.    The CI told detectives that when CI wanted cocaine CI would call MATOS on a cellular telephone and order a quantity of cocaine and that MATOS would tell the CI where to meet him. The CI would then meet MATOS at the pre-arranged location, where MATOS would deliver the cocaine.

7.    Based on the CI's information, detectives opened an investigation into the reported illegal activities of MATOS and DIAZ. Detectives learned through the Registry of Motor Vehicles ("RMV") that MATOS' address was 342 Hathaway Boulevard, Apartment 35, New Bedford, MA.

8.    From December 4, 2004 through February 26, 2004, New Bedford detectives conducted surveillance of the activities of MATOS and

3

DIAZ. Initially, surveillance was established at Gomes'
residence at 111 Park Street in New Bedford. On several
occasions both MATOS and DIAZ were seen making brief stops at
that address. Both MATOS and DIAZ would enter the residence and
then depart within minutes. Moving surveillance would then
observe MATOS and DIAZ make several brief stops at locations
throughout New Bedford. During these brief stops, MATOS and DIAZ
would pull up to an awaiting car. The car's occupant would then
get out, approach MATOS' and DIAZ's car, and either get into
their car or stand at the driver's or passenger's side window.  A
brief transaction would then take place. Based on Detective
Ramos' training and experience, it was his opinion that this
activity was consistent with street-level drug transactions.  In
addition, this activity was consistent with the way in which
MATOS delivered cocaine to the CI during a controlled purchase
during the week of January 4, 2004.

9.   During the surveillance, detectives also noticed that MATOS
and DIAZ made frequent stops at 11 Spruce Street, New Bedford, 38
Ashley Street, New Bedford, and 342 Hathaway Boulevard (MATOS'
residence). During the surveillance of 342 Hathaway Boulevard,
the vehicles listed in paragraph 10 would be seen parked at the
address at different times. On several occasions MATOS and DIAZ
were followed from 342 Hathaway Boulevard to either 111 Park
Street or 11 Spruce Street. Detectives conducting surveillance
then observed MATOS and DIAZ engage in several suspected drug
transactions. Detectives then followed them back to 11 Spruce
Street.

10.   During the course of the surveillance, the detectives noted
that MATOS and DIAZ were using several vehicles, only one of
which was registered to one of them. Detective Ramos' knew from

4

his training and experience that the use of multiple cars registered to other people was a tactic used by drug dealers to impede investigations. The cars used included: a black Mitsubishi 3000GT bearing Massachusetts registration 89JS40, registered to MATOS; a gold Dodge Intrepid bearing Massachusetts registration 2033WP; a Green Acura 32 TL bearing Massachusetts registration 34MF0, registered to an Angel Quinones; a rented white PT Cruiser bearing Rhode Island registration 89J840, rented by Angel Quinones; a white Plymouth Voyager bearing Massachusetts registration 24ZX20. In addition to using all of these vehicles, detectives observed that the license plates for these vehicles were routinely switched among all of the vehicles.

11. During the week of January 4, 2004, the CI, under the direction of Detective Ramos, made a controlled purchase of cocaine from MATOS. Prior to the transaction, Detective Ramos searched the CI for narcotics with negative results. Detective Ramos then maintained constant surveillance of the CI before and during the transaction. Prior to the arranged transaction, other surveillance units observed an individual matching MATOS description depart 342 Hathaway in the white Voyager van. This individual went to 11 Spruce Street, where he was observed entering the rear of the building using a key. He stayed a short period of time and then returned to the car. He was followed as he traveled to a series of garages located on County Street in New Bedford. There, he was observed entering one of the stalls with a key. After this brief stop, he was followed and was observed meeting with several other suspected drug customers in the north and west ends of New Bedford. He then arrived to the prearranged meet location and Detective Ramos observed the CI enter MATOS' car for a short time. The CI then departed and

5

proceeded directly to Detective Ramos' surveillance point, where
he handed Detective Ramos the quantity of cocaine which the CI
stated he purchased from MATOS. The substance was later field-
tested and tested positive for cocaine.

12. On January 26, 2004, the officers set up surveillance at 342
Hathaway Boulevard again. They saw a green Mazda Millenia
bearing Massachusetts registration 24ZX20. This is the same
registration that had previously been attached to the white
Plymouth Voyager. RMV records revealed that the registration had
been transferred to the Mazda effective January 23, 2004. It was
registered in the name Elliot Cordero. Around this same time,
Detective Ramos noticed that the registrations on some of the
other vehicles had changed as well. The Plymouth Voyager now had
Massachusetts registration number 329WLB attached to it, which
had been attached to a Pontiac Sunbird at the time of Detective
Encarnacao's previous investigation of MATOS.

13. On February 26, 2004, at approximately 5:00 p.m. the CI
called Detective Shain Ramos and told him that he had just
purchased cocaine from MATOS out of the green Mazda. This
transaction was not authorized by detectives. At approximately
9:30 p.m., detectives located the Mazda in a gas station parking
lot at Kings Highway and Church Street. The detectives observed
DIAZ get into the driver's seat and MATOS enter the front
passenger seat. The detectives followed the car to Cranston,
Rhode Island, where it backed into a driveway and MATOS and DIAZ
exited the car. Three to four minutes later, MATOS and DIAZ got
back into the car and headed back toward Massachusetts.
Detectives decided to stop the car in New Bedford based on all of
the information known to them, including the fact that the CI had
provided information that the drug supplier was in the

6

Providence, Rhode Island area.

14. At approximately 11:30 p.m., the detectives stopped the car
when it entered New Bedford and removed both MATOS and DIAZ from
the car and separated them.  In plain view in the area of the
front passenger seat the detectives saw a large amount of cash,
some of which was wrapped in an elastic.

15. Detectives spoke to DIAZ alone after reading him his Miranda
Rights.  DIAZ told the detectives that he and his friend went for
a ride to Fall River to look at a job.  He said the car was owned
by a friend of his friend's and that the individuals name was
Angel.   The detectives then spoke with MATOS alone after reading
his Miranda Rights.  MATOS said that he and his uncle went to RI
to pick up some money for a car he was selling.  He said that the
car belonged to a friend of his named Elliot.

16. Detectives looking inside the vehicle made observations
which suggested the vehicle may have a secret compartment for the
storage of drugs.  Detective Mark Blouin, who received training
in the detection of such compartments, noticed that the dashboard
in the area of the airbag was scratched and it appeared to be
from wear and tear.  Detective Blouin knew that it was common for
a vehicle with a secret compartment to have such wear and tear
from the opening and closing of the compartment.  Detective
Blouin's observations of the wiring and electronics of the
vehicle were also consistent with the presence of a secret
compartment.  Using four separate electric components of the
vehicle in a particular sequence the dashboard lifted up
approximately eight inches.  This revealed a secret compartment.
Inside the compartment was a paper towel with plastic bag inside.
The plastic bag contained a white powder substance believed to be
cocaine.  Also inside the compartment was a fully loaded Rossi.

7

model M971, .357 caliber, revolver, loaded with 6 rounds of .357
ammunition. Over $4000 in U.S. currency was recovered from MATOS,
DIAZ, and the car.

17.  The green Mazda operated by MATOS and DIAZ and which
contained the cocaine and a loaded revolver on February 26, 2004,
was registered to Elliot Cordero, 109 Bullard Street, 2nd floor,
New Bedford, MA. On March 19, 2004, detectives interviewed
Cordero regarding this vehicle. Cordero advised detectives that
in either January or February his friend Jonathan MATOS asked him
to register and insure a car for him so that MATOS could save
money on insurance. Cordero said that he agreed to do so but that
he was never in the car and only saw it on one occasion when
MATOS came to his house to pay for the car insurance. Cordero
advised that he has known MATOS for approximately six years.

18.  The green Acura was registered to Angel Quinones, 41 Scott
Street, Apartment 10, New Bedford, MA.  I interviewed Quinones on
May 19, 2004 and May 27, 2004. Quinones advised me that he went
to school with Jonathan MATOS, but that they did not remain close
friends. At some point MATOS approached Quinones and asked if he
would register and insure a car for him so that he could save
money on insurance.  Quinones advised MATOS that he had lost his
license at some point so his own insurance was already high.
MATOS still asked him to register the car anyway and Quinones
agreed to do so.  Quinones said that he never drove the car, he
never sat in it and he did not receive any money from MATOS for
registering the car for him.  At some point later that winter,
Quinones received a call from MATOS saying that he had an
accident on the highway in Connecticut and that the Acura was
totaled.  Quinones said that he handled all of the paperwork for
the insurance. MATOS then asked Quinones if he could rent a

8

replacement vehicle for the totaled Acura. Quinones agreed and
said that he met MATOS and another individual Quinones described
as "fat" at the car rental agency. Quinones said that all three
went into the rental agency, but that the "fat" guy went outside.
He said that MATOS gave him some money and he rented a white PT
Cruiser for MATOS. He said that he gave MATOS the keys to the
rental car. Quinones said that he left in his car, MATOS left in
the rented car and, the "fat" guy departed in the car that MATOS
and the "fat" guy arrived in (a black two-door car). I showed
Quinones photo copies of 2 photo spreads each containing 6
photographs prepared by NBPD OCIB. Quinones correctly identified
photograph 4 as the individual he knows as Jonathan MATOS. He
identified photograph 5 as the "fat" guy that dropped MATOS off
at the car rental agency. Photograph 5 is a picture of Ramon
DIAZ.

19.  ATF Special Agent Angelo Thurman, Interstate Nexus expert,
reviewed reports that described the firearm and ammunition seized
by the New Bedford detectives. According to Special Agent
Thurman, neither the firearm nor ammunition were manufactured in
the Commonwealth of Massachusetts and therefore have previously
traveled in interstate commerce.

20.  The white powder substance recovered from the hide located
in the dashboard of the Mazda weighed approximately 17.30 grams
and tested positive for cocaine.

21.  I have reviewed the computer printout from the Massachusetts
Criminal History Board for Ramon DIAZ, which reflects at least
one felony conviction prior to February 26, 2004 for a crime I
know to be punishable by a term of imprisonment exceeding one
year. DIAZ was convicted of possession of a firearm (2 counts),
possession of ammunition, possession with intent to distribute

9

class C narcotics, and conspiracy to violate the Controlled Substance Act, in Bristol County Superior Court and received a sentence of 4-5 years committed. DIAZ was also convicted of Possession with intent to distribute Class A (Heroin) narcotics (2 counts), trafficking a controlled substance in a school zone (2 counts) and conspiracy to violate the Controlled Substance Act in Bristol County Superior Court and received a sentence of 4-5 years committed.

22.  Based on the above, I believe there is probable cause to conclude that on or about February 26, 2004, in New Bedford, Massachusetts, Ramon DIAZ, previously convicted of a crime punishable for a term exceeding one year did unlawfully possess a firearm and ammunition which had traveled in interstate commerce in violation of Title 18, U.S.C., Section 922(g)(1); and that both DIAZ and Jonathan MATOS did use/carry a firearm during or in relation to a drug trafficking crime, in violation of Title 18, U.S.C. Section 924(c); and that both DIAZ and MATOS did possess narcotics with the intent to distribute in violation of Title 21, U.S.C., Section 841(a)(1).

Sheila M. O'Hara
Special Agent
Bureau of Alcohol, Tobacco,
Firearms and Explosives

Subscribed and sworn to before me this twenty-eighth day of June, 2004.

Charles B. Swartwood
United States Magistrate Judge

10

## CERTIFICATE OF SERVICE

I, Raymond A. O'Hara, appearing attorney for the Defendant Ramon Diaz in this matter hereby certify that true copies of the within Motion and Memorandum have this date been mailed, postage prepaid, to all counsel of record.

DATED: September 6, 2005

Raymond A. O'Hara, Esquire
1 Exchange Place
Worcester, MA  01608
(508) 831 7551
BBO #546366